All right, welcome to day two of the West Coast Court panel. Before we begin, I'm advised we have a guest in the courtroom, the Honorable Justice Greenwood, Judge of the Federal Court of Australia. Good morning to you. Welcome to America and to our court. And thank you for choosing the West Courtroom to come in and sit in and visit. I appreciate it. I'm sorry I didn't get a chance before court to greet you personally, but we welcome you here for as long as you're here and hope that you enjoy the hospitality in the area. Thank you. All right. All righty. First case up, Crampton v. Weizenbaum. Is that the way to pronounce it? All right. Mr. Walsh. May it please the court. My name is Colin Walsh and I represent appellant Jennifer Crampton. This case is about textbook whistleblower activity and quintessential free speech. As a state employee, Jennifer Crampton's report of a violation of law to the Office of the Inspector General is protected by the Texas Whistleblower Act. As a citizen of the state of Texas, Jennifer Crampton's letter to her elected representative making allegations of violations of law and mismanagement by dads, a state agency, is protected by the First Amendment. And a governmental employer may not fire an employee for doing either of those two things. Yet here a reasonable jury could find that that is exactly what happened to Ms. Crampton. On April 1, 2016, a team of managers, human resources, and legal staff met to discuss my client, Ms. Crampton. According to the contemporaneous meeting notes at record pages 678 to 679, during that meeting they discussed Crampton's OIG complaint and her letters to her elected representatives. After that discussion, according to the decision maker, Sylvia Rodriguez, they decided to terminate Ms. Crampton. And you can find that at record page 615. When Ms. Rodriguez was asked what information she considered in making the termination decision, she stated without qualification, all information, everything that's happened so far. And that's at record page 616. Essentially with that statement, Ms. Rodriguez was admitting that dads was terminating Ms. Crampton because of her protected activity. Opposing counsel will not be able to point any evidence in the record out to this court that conclusively negates a single fact that I just told you. To be sure, I expect opposing counsel to have a different interpretation of those facts and to ask this court to weigh the evidence differently. For example, I expect opposing counsel will argue or point out to this court that some of the attendees at that management meeting do not recall discussing Crampton's protected activity. Or argue that when Ms. Rodriguez said that she terminated Crampton because of everything that's happened so far, what she really meant was everything that's legal to terminate an employee for. So what you're really arguing is that she's sort of permanently protected against getting fired because she engaged in protected activity? No, Your Honor, I'm not arguing... Why is that not what follows from what you're saying? Well, because the evidence in this case shows that the decision makers considered her protected on that protected activity. Taking Ms. Rodriguez, the decision maker, at her word, when she says that she terminated Crampton because of all of the information, because of everything that's happened so far, that includes Ms. Crampton's protected activity. And a jury could find from that evidence that Dad's terminated her because of her protected activity. And because the district court did not make that reasonable inference in favor of Ms. First, I'd like to discuss Ms. Crampton's Texas Whistleblower Act claim, and then I'd like to discuss her First Amendment claim. Under the Texas Whistleblower Act, a person must show that she is a public employee who reported a violation of law in good faith to an appropriate law enforcement authority and that caused an adverse action. Here, the only element challenged by defendants is the causation element. And to obtain summary judgment on causation in a Texas Whistleblower claim defendants must conclusively prove that no reasonable jury could find protected activity caused the termination. As the Court of Appeals for San Antonio stated, at summary judgment the but-for standard requires conclusive proof that the report of a violation of law did not play a role, however small, in the defendant's decision. Here, dad and defendants cannot meet their burden on summary judgment for three reasons. Temporal proximity, the management meeting where her protected activity was discussed and then the decision to terminate was made, and Rodriguez's testimony that she considered that she fired Crampton for everything that's happened so far. Regarding temporal proximity, there is a fact issue for causation for two reasons. First, under the Texas Whistleblower Act, there is a presumption of causation if a protected report occurred within 90 days. Here, on record page 811, it shows that Ms. Crampton made a report of a violation of law to the Office of the Inspector General on March 30th. On record page 812, it shows that the OIG notified Ms. Rodriguez on April 1st, 2016. And we also know from the contemporaneous meeting notes that on April 1st, 2016, management, including Ms. Rodriguez, discussed Crampton's OIG report before then deciding to terminate her. And again, that is on record page 615. The opposing brief urges that there is a, the presumption you mentioned is rebutted in this case by the listing of factors that they say identify that was going on at least contemporaneously with all of this conduct of your client, you know, various workplace type matters, whether disciplinary or otherwise, but they argue all of that was in the setting between, during, and overlapping in the same time period of your argument of the protected conduct. So the question is, what under the Texas Whistleblower Act, what amount of evidence or quality of evidence is necessary in your mind to rebut the presumption that you've urged? If so, and in this case, why not? Do you understand my question? I got you on the presumption, but under the Texas Whistleblower, I'm just asking, you know, what quantity or quality of evidence, if at all, is available under the Texas Whistleblower in order to rebut that presumption? Or is it your argument that it's more than a presumption? Once your client establishes it, that's it? No, Your Honor. And if that was the impression I gave, I apologize. I do not mean to say that it's a conclusive presumption or conclusive as a matter of law, this temporal proximity presumption. But what I will say is that temporal proximity alone, according to the Austin Court of Appeals, can uphold, according to the Austin Court of Appeals, a verdict for retaliatory discharge may be based upon the immediacy of suspension or termination following a report. That's from the Tom Ave v. Oakes case out of the Austin Court of Appeals, and the petition to the Texas Supreme Court was denied. But even if there wasn't temporal proximity here, there are two other pieces of evidence that establish causation, and I believe this probably more directly answers your question, Your Honor, and rebuts their argument that there were other factors. First, there is the meeting where the protected activity was discussed. As the Torres case says, or as the San Antonio Court of Appeals said in Torres, defendants cannot simply negate causation by listing a whole host of reasons. Again, they must show conclusive proof at the summary judgment stage that the protected activity did not play a role. And here there are four cases that show the evidence in this case is sufficient to create a fact issue. That is Fort Worth v. Zimwick, a Texas Supreme Court case, Ion v. Chevron, a Fifth Circuit case, Torres v. City of San Antonio, a San Antonio Court of Appeals case, and Gardner v. CLC of Pascagoula, a Fifth Circuit case, and I believe Judge King was on that panel. In the Torres and Gardner case, this court held that taking adverse action for reasons that include protected activity creates a fact issue for but-for causation. So, for example, in Torres, the plaintiff was not promoted because of his impulsiveness or impulsivity, and when that was explored, it turned out that it was his impulsiveness to go and report a violation of law. In Gardner v. CLC of Pascagoula, this court found that the plaintiff was fired for insubordination, and that insubordination included the alleged protected activity or refusing to care for a patient who was sexually harassing the plaintiff. Here we have that same evidence because here the reason given that Sylvia Rodriguez, the decision maker stated, the reason given for termination was all information, everything that's happened so far, and that necessarily includes, if we take her at her word and take her statements as true, that necessarily includes her protected activity. Under the Texas Supreme Court case in Zimlick and the Fifth Circuit case in Ion v. Chevron, evidence of referencing a protected activity in connection with an adverse action was sufficient to create a fact issue as to but-for causation. In Zimlick, the Texas Supreme Court held in a Texas whistleblower case that the statement, lucky to have a job after the Peters incident, was sufficient to sustain a jury verdict for retaliatory discharge. The Peters incident was a reference to the protected activity in that particular case. In Ion v. Chevron, this court held that simply referencing a leave of absence that was protected by FMLA leave in the same letter, in the termination letter, but not even explicitly listing that as a reason for termination, was sufficient for a jury to infer causation and retaliation under the particular statute. So based on those four cases, the evidence in this case creates a fact issue. Just as a jury may infer fire from evidence of smoke or rain from a wet umbrella, a jury may infer the reasons for termination based on the topics discussed at the termination meeting and the testimony of the decision maker. Here, again, at the meeting where the decision to terminate Ms. Crampton was made, her OIG complaint was explicitly discussed, and that's on page 678 of the record. And Sylvia Rodriguez, when asked why Crampton was terminated or what information she considered, she said, everything that's happened so far. That includes her protected activity. And so summary judgment should be reversed on Ms. Crampton's Texas whistleblower claim. Regarding Ms. Crampton's free speech claim, the district court granted summary judgment on two counts. First, the district court said that the speech was not precisely identified, and second, that reports of the violations of law and malfeasance that Ms. Crampton made were not matters of public concern. On appeal, defendants also challenged the causation element and asserted the Mount Healthy affirmative defense that they would have taken the same action regardless of protected activity. The district court erred in the first reason, because the speech has been precisely identified under the very case that the court cites, which is the Foley case. That case requires simply evidence of when the report was made, what was contained in that report or what was said, to whom it was made, and whether it was oral or written. All of that evidence is in the record in several different places. For example, Ms. Crampton meets those requirements in her initial complaint at record pages 22 through 29. She meets it in her summary judgment response at record pages 565 to 566. She meets it in her deposition testimony on record pages 133 to 35, and in the MSJ exhibits, or motion for summary judgment exhibits, filed by both plaintiffs and defendants in the briefing in that manner. In fact, exhibit B to defendants' motion for summary judgment is called Plaintiff's Report to Outside Agencies, and that's at record page 166. But the main issue here, I think, is whether or not Ms. Crampton spoke on a matter of public concern when she wrote to her elected representatives. In here, the critical decision is Judge Stewart's opinion in Modica v. Taylor. In Modica v. Taylor, this court held that a letter to a state representative alleging violations of law, mismanagement, and malfeasance by a state agency was a matter of public concern. And to reach that decision, this court looked at the content, form, and context of the speech at issue. Regarding content, what this court held was that the allegations of violations of law, mismanagement, and malfeasance were matters of public concern, and that those outweighed the fact that there was an element of personal interest in this case, in the Modica case. In Modica, the letter included allegations of violations of law as well as complaints that she was a victim of retaliation and discrimination, and complaints about internal policy decisions regarding things like baby showers on state property. In that case, this court held that that did not outweigh the allegations of violations of law. Here, the content weighs even more heavily in favor of finding protection, because as defendant admits in their own brief on page 6, the packets of information, the letters that Crampton sent to her elected representatives, did not include any allegations of retaliation or discrimination. Instead, it says that she wanted to do this because she was worried that somebody was going to get hurt, and she could no longer sit by and let this happen. And again, that's record page 166, where she states exactly why she did it. The form, in Modica, this court held that a letter to a state plaintiff was militated in favor of protection. Here, this is a letter to a state representative, again, outside of the particular agency that Ms. Crampton works for, and so it also, like in Modica, militates in favor of protection. Regarding context, the court found that most of the letter in that case focused on the impact that the violations of law and the mismanagement were going to have on the public. And so the context here is the same for Crampton. Her letter does not include allegations of retaliation or discrimination, but instead focuses on the impact these violations of law, on the impact she believes these violations of law will have on the public. She believes that these violations of law will cause citizens of Texas to get hurt. She believes that she can no longer sit idly by and watch these things go on. And at the time that she wrote this letter, at the time she first started sending her packets of evidence to her elected officials, she had not been formally disciplined by that. And in fact, her job was not in jeopardy. She had no reason to think that her job was in jeopardy. And it doesn't state anywhere in her initial letter on pages 166 to 67 of the record that she was worried about her job or that she was motivated by a fear that her job was going to be taken away. And because all three, content, form, and context, militate in favor of protection, we ask this court to reverse summary judgment on the First Amendment claim, finding that she did speak on a matter of public concern. The causation element is the same as with the Texas whistleblower claim. Again, the discussion at the meeting where the termination decision was made included discussion of the letter from Michael McCall's office, a U.S. congressman. And so a reasonable jury could infer that that motivated the decision, especially in light of Ms. Rodriguez's testimony, that she considered everything that's happened so far. All right. Mr. Wallace, thank you. You've reserved your rebuttal time. We'll hear from Ms. Hacker. May it please the court. A public employee may not simply start making complaints to government officials as an insurance policy against losing her job for legitimate and nondiscriminatory reasons and then claim refuge under the First Amendment and the Texas Whistleblower Act. The record in this case plainly shows that Jennifer Crampton was a disruptive, uncooperative employee, and that's why she was terminated. There are two main reasons that Crampton's claims fail and the district court's judgment should be upheld. The first reason is that her speech was not a matter of public concern. The context of her speech was a personal dispute with her employer, and she admitted she spoke because she thought it would prevent the agency from terminating her. The content of her speech was related to disputes over internal procedures and private matters, not a violation of law. The second reason is that Crampton cannot establish causation because there is ample unrebutted evidence in the record justifying her termination for disruptive and unprofessional behavior, even if her speech played a role in the termination, which it did not. Frame this for us succinctly in this sense. Counsel opposite argues in the brief in here that what's really happening is she does her protected speech, yada, yada, yada, all this other stuff comes up as a way to stick a pin in that balloon. Red brief says no, all this other disciplinary stuff is going on, and then she does this to do it. So it's like this, and so it's like which came first, chicken or egg, in terms of sequence and so on and so forth. And it's all in the record, and we've got it sorted out. So my question is, and the last thing he said was, well, quote, her job was not in jeopardy when all this transpires, et cetera. So my hopefully short question is just what's the framework on disciplinary action, et cetera? Context-wise, was there some kind of disciplinary procedure or whatever, in place going on when the letter started going out and so on and so forth, or do we have just kind of what's in the record, a slew of stuff that was going on, but it wasn't formalized in any kind of way, you understand what I'm saying? Not just on this day this happened, but just give us kind of a snapshot so we can understand the framework of the arguments. Yes, Your Honor. The disciplinary actions, and by disciplinary actions I mean also counseling or coaching sessions where her supervisor is sitting her down and saying these incidents that you've taken or these incidents that have taken place are not acceptable in the workplace and you need to change this behavior. So not necessarily formal disciplinary proceedings. Those began all the way back in April 2015 with her original supervisor. She was addressed twice by that supervisor in April. She was addressed again in July 2015 by her new supervisor because the behavior continued. The behavior really started escalating in September 2015 when she applied for a job and did not receive an interview. She angrily confronted three of her supervisors that month. There were six documented incidents of unprofessional behavior in October 2015, including three on October 16th alone. And then we know that it was received on October 23rd, her complaint to the governor's office, and she testified that she believed she sent that complaint out first. So, in other words, there was already a history of this unprofessional behavior starting before she sent her packet of information to the governor's office. Was the meeting scheduled before she sent that packet? The second level reminder meeting was in November 2015, right at the beginning of November 2015. I'm not sure if it's in the record when exactly that meeting was scheduled, but the record does show that on October 20th, there had already been discussions between Sylvia Rodriguez and some of the HR individuals as to what kind of action to take, and then they decided on the second level reminder, and then they had the meeting after that. So the discussions that were going on regarding what to do about her behavior started before she sent the governor's office the complaint. Was that in the context, in that workplace, is there like a, what do you call it, progressive disciplinary process, you know, in other words, where you start with the informal counseling, then this, then this, and the employees tell, well, if this doesn't end, then we lead to theirs. So, or were these just a series of counselings, but were they, you know, a predicate to a process that if this doesn't end by then, X happens, or does the record just show us, you know, these sessions where someone spoke to her, but? The earlier sessions were an attempt as more of an informal resolution to try to point out to her that this behavior was unacceptable and get her to change, but because it kept occurring, that's when they started the formal process, and that would begin with the second level reminder in November 2015. And that actually is a set process. They sit down. They have a letter that they discuss. They go over with the employee, and there is actually a notation placed in the file. It's, they have like an action plan that results from that meeting, and that's placed in the employee's file, and over a certain time period, the employee is required to adhere to the action plan set forth. If they don't, then the disciplinary process will continue or escalate based on the failure to adhere to the conditions in the second level reminder. So does the record show, I mean, does she sign off on, you know, acknowledging I had this session? In other words, we look in the record. I mean, is, you know, her signature, you know, acknowledging the sessions and on and on. Is that, you know?  Yes, that's all in the record. Do you agree with your opposing counsel's characterization of Texas law that if there is some evidence of protected activity that could have played a role, no matter how small in the termination, that's a fact question? No, Your Honor. What case do you say sets forth Texas law? In the Zimlet case, the Texas Supreme Court held that it's not enough to satisfy the plaintiff's burden where evidence that an, or they held that evidence that an adverse employment action was preceded by a superior's negative attitude towards an employee's report of illegal conduct is not enough standing alone to show a causal connection. And then more recently, the Texas Supreme Court in Alamo Heights ISD v. Clark had a lengthy discussion of the but-for causation standard, which is what applies here. And there, the Texas Supreme Court held that just questioning the credibility of the defendant, which is essentially what the plaintiff has done here, is not enough to create a fact issue on causation. Additionally, the Torres decision's articulation of the standard, that the burden is to somehow exclude any other, any potential role that the speech played, that's just inconsistent with the standard of proof. Whether you want to characterize it as an affirmative defense or not, the causation element is still there. And the plaintiff has the burden under the Texas Whistleblower Act to prove that the termination was, or that the speech was the but-for cause of the termination, meaning that they would not have been terminated when they were if not for their protected speech. If the defendant can come in and show that there were lots of other reasons why the employee was terminated that had nothing to do with the speech, then any presumption that was established earlier because of temporal proximity or anything, any other circumstantial evidence, has been rebutted. And the plaintiff has to show, again, and this is just all part of the but-for causation standard, the plaintiff has to show that that speech was the cause of the termination, or that they wouldn't have been terminated at the time if it hadn't been for the speech. The plaintiff has not shown that in this case. The cases you're citing, are they summary judgment cases or are they cases that went the full length? I believe that the Zimlick case was a summary judgment case and Alamo Heights ISD v. Clark was a summary judgment case, Your Honor. Well, he argues, and it has at least facial plausibility, that the note that occurred after the packet of material had been sent to the governor said for all that's happened, for all the things that have happened before were terminated. That would include sending out the letters, wouldn't it? That could. At least facially. It could, but that's a very vague statement, and really the inference could go either way on that. I'm not sure it's very clear. And in terms of how to interpret that statement, there's something that's more clear in the record that I think the Court should be aware of. At 271, the termination letter, Sylvia Rodriguez states, I have considered all information available to me. This is similar to what she said in the deposition. I have considered all information available to me. Based on this information, I have decided your actions constitute grounds for disciplinary action. Under the Human Resources Manual, Chapter 11, she refers to repeated offenses regarding following instructions, courtesy and respect, failure to act in a way that doesn't interfere with the workplace. So using the same language that she used in the termination letter, the termination letter clearly refers to her disciplinary history as all of the reasons that she's considering in making the termination. So, you know, I guess you have to say there's no fact question here at all that her sending all these letters played no role in her firing. I mean, and how could that be? I mean, if I was running that agency and I had an employee doing what she was doing, you talk about putting a knife between your shoulder blades, that would be it. I mean, how could you say that that didn't play any role in her termination? They're human beings. It's got to play a role. It has to have played a role. There's no evidence in the record that it did play a role, especially where the causation element is so undercut by all of the extensive disciplinary record that Crampton has. I mean, the idea really when the court looks at her whole history of disciplinary action and if the court reads the transcript of the decision-making leave meeting or listens to the audio of that recording where you can really hear her tone and the way she's speaking to people, there really is no serious argument that they had no basis to terminate her based on that behavior. Oh, I agree. I mean, I'm confident that's right. I mean, I'm confident there are multiple reasons in this record that they could and undoubtedly did have for terminating her. The only question is did all her communiques to state agencies and officials, was that a problem? Did that play a role? And it seems to me it must have. There is no evidence in the record that it did, Your Honor, and even if it did, as this court held in Gerhart, even if we assume that the exercise of protected activity played a substantial role in the decision to terminate the employee, it's not unconstitutional if the employee would have been terminated anyway. What about the Texas Whistleblower Act? The Texas Whistleblower Act, it goes back to the issue of but-for causation, and the plaintiff has not proven that the termination was due to the speech alone as the but-for cause where she cannot separate out these other potential causes for her termination. And here the evidence of legitimate reasons, legitimate nondiscriminatory reasons for terminating her employment is significant and more importantly unrebutted. They have not rebutted any of this evidence here other than to show, other than to say that Sylvia Rodriguez was lying. That's not enough to create a fact issue. As I've mentioned already in a couple of cases, the courts have held that. And importantly, even if we assume that Rodriguez made up all of those things, there's corroboration by others in the characterization of her behavior that we're not accused of retaliation in this case. Cindy Borland and Robbie Craig attended meetings with Crampton, observed her negative behavior. The governor's office wasn't involved in this at all, independently observed her rude and aggressive manner, yelling at people on the phone and demanding to speak with somebody with the governor's office immediately or she would personally come down there. So this all supports the long history, the well-documented history, of these problems in the workplace, and that was why she was terminated. We've gotten to that. I mean, it's a summary judgment. That's why I ask you if those other cases were summary judgments. Rule 56 says you can construe the evidence in a light most favorable to the non-movement. So in this case, she's a non-movement. So, you know, this is close or whatever. What do you do with that? I mean, and I'm not sure in all those other cases because I haven't read them all. I mean, you know what to do with it. Obviously, Rule 56 says you can't just rest on conclusory allegations, which is what I assume you're arguing, but at the same time, did the district judge construe the evidence in a light most favorable to the non-movement in terms of I think where we're hung here is this fact issue. You know, at least I think we're all kind of hung up on . . . I don't mean hung up, but the fact issue is worrisome, you know, when the argument is that you're entitled to summary judgment as a matter of law. Counsel obviously argues vigorously and with some force that, you know, at a minimum there's kind of a mixed deal here sequentially and what happened first. And Rodriguez says, well, all of the factors. She doesn't say all of the disciplinary factors, all of the factors. Well, does he get . . . if that's construed in his client's favor, then does he get sort of a pass that that means the protected speech? So help us understand that we're at the pot. So, I mean, ultimately, we don't care who wins or loses. That's not our job. But we're dealing with Rule 56 where summary judgment was granted on the whistleblower and on her free speech claim, which means you're saying title of judgment as a matter of law. There's absolutely no fact, no issues. Now, take you to say she doesn't deny that the disciplinary matters occur, but he argued her job was not in jeopardy at the time, notwithstanding all that. You know, she hadn't gotten anything saying you will be fired on X date or whatever. You just got all these progressive, you know, kind of matters there. So why isn't that something a jury ought to, you know, sort through? I would go back to my response on the Gerhart case. Even if those other cases say what they say, why in this case is it not one, you know, that a jury ought to sort all this out, you know? Yes, Your Honor. Well, in the Gerhart case, the court said that even if we assume that the speech played a substantial role, if the employee would have been terminated anyway, then it's not unconstitutional. But going back to there's a separate ground that the court could hold for the defendants in this case, which is undoubtedly a question of law, and that's whether or not her speech was in the public interest. Here we have an admission from the plaintiff that the reason that she made her statements was, quote, to save her job, in other words, to prevent the defendants from terminating her. This cannot be considered protected speech, or it would allow employees to make complaints merely as an insurance policy for being fired for cause. It's a very good argument. I mean, what you're saying is I'll go ahead and make all this protected speech and thereby inoculate myself against getting fired. And that is a legitimate way, I think, to look at this case. Whether it's a winning way or not, I don't know. But it is certainly, you know, when you see the risk of getting fired, then you engage in protected activity. Shazam. At least I've got a jury case here if you get a lawyer. That's right, Your Honor. And even if she wasn't at the verge of termination when she started making these complaints, she could still see the writing on the wall. She thought that her supervisor did not like her. She felt like she was being picked on and singled out. The evidence is full of this effort. And she admitted she did it to save her job. So it doesn't matter that she was not on the verge of termination when all of these complaints occurred. And in looking at the context and the content of her speech, the context of her speech, again, going through the timeline, was made in the context of a dispute with her employer. And also the content of the speech was relating to internal procedures, the temporary suspension of requiring resumes for management chain requests and the process for correcting data entry errors. As the Supreme Court held in Connick, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. So even the content of her speech itself shows that it was made not in the public interest. As this court recognized in Harris, almost anything that happens in a public agency could conceivably be of interest to the public. So instead of looking at whether the public has an interest in the employee's statements, the court examines whether the speaker's motivation was to speak primarily as a citizen or as an employee. And again, in this case, Ms. Crampton admitted her motivation here. Her motivation was to save her job and prevent the agency from terminating her. The district court's decision granting summary judgment to the defendants was correct. Crampton has not met her burden under either the First Amendment or the Texas Whistleblower Act, and there's no genuine issue of material fact on either claim. As the record shows, she was terminated because she was a problematic employee. The district court's judgment should be affirmed. Thank you. Thank you. Back to you, Mr. Walsh.  I have three points that I would like to make here in rebuttal. First, opposing counsel brought up several issues regarding Ms. Crampton's allegedly unprofessional behavior and alleged prior counseling. That's actually a fact issue, and we would dispute whether or not she had been counseled prior to her letters. The e-mails that they were referring to are not referred to as counselings at the time. They were not formal discipline. In fact, after the first two e-mails that they referenced as alleged counseling, Ms. Grasmick, the supervisor at the time, actually rated Crampton commendable and stated specifically that she interacts with co-workers in a positive manner. That's on record page 593 and 596. There are also other co-workers who will say that she was not unprofessional. We have testimony from Ms. Nelson, a co-worker, and Ms. Schindler, a co-worker, and we also have a declaration from Ms. Grasmick saying that she was professional. So I think at the very least that is a fact issue for a jury to decide. The second point I would like to make is that I think your concerns are well taken that this is a summary judgment case where they have to conclusively show that no reasonable jury could find in their favor, and whether or not they have a plausible argument that a jury might go with is not really the issue here because all reasonable inferences must be made in favor of Ms. Crampton. If you just look at the Texas Supreme Court case in Zimlick, that was after a jury trial, and the court upheld a jury verdict in favor of the plaintiff for a Texas whistleblower claim on one of the elements. Here's the evidence from the case that they found sufficient. Zimlick, the plaintiff, asked Donahoe, his supervisor, why he put Zimlick in the low-level assignment. Donahoe stated that Zimlick was lucky to have a job at all after the Peters incident. We conclude this circumstantial evidence adheres to the standard we announce in Continental Coffee and is legally sufficient to support a jury finding that Donahoe's assignment of Zimlick to security duty was a result of Zimlick's report. Here we have that same type of evidence. We have a meeting note showing that they discussed her OIG complaint, and we have Ms. Rodriguez testifying that she considered all information, everything that's happened so far. I was listening to opposing counsel read the actual termination notice, and nothing in there contradicts or at least conclusively negates Ms. Rodriguez's testimony. Again, she says, I considered all information available to me. As Judge King pointed out, that necessarily includes Ms. Crampton's protected activity, and as Judge Owen also pointed out, that necessarily includes her report to the OIG, and we know that they considered it because of the meeting notes. Finally, I'd like to just take a step back and look at the big picture here because Crampton did what employees are supposed to do and what they're told to do when they see violations of law. She first went to her supervisor, then her supervisor's supervisor, and only when they did nothing about these violations of law did she start writing to her elected representatives and report them to the Office of the Inspector General. And then- Were these really violations of law? I didn't understand that it- I thought that her- I may have misunderstood it. I thought her position was that it is not wise to change the application process the way you're doing it because you can't identify whether a key component that you should have before you hire somebody continues to exist. I thought- I didn't think it was a violation of law issue. I thought it was just a matter of whether it was unwise. Well, she alleged conduct that she believed to be a violation of law. She didn't believe that this was unwise. She believed it violated the statutory requirement that dads review qualifications for personnel changes at these home health care agencies. And she actually states as much on record page 169 where she writes in- it appears to be sharpie- this is where the staff is being told to break the law. You can pull up the reg online. And then if you go to record page 171, she writes, this is a direct order to not follow the law. And that's also supported by testimony from Laura Schindler, a co-worker, who trained staff in the requirements that dad had to meet in reviewing personnel changes and from Becky Nelson. And I see I'm out of time, but if you'd like me to go into a little more detail on this violation of law issue, I'm happy to do so, Your Honor. No, I think you've gone full bore. One of the closing statements counsel obviously made was- Ms. Crampton admitted that- well, she didn't say it this way, but she admitted in somewhere in there that the writings or whatever were in order to save her job. Words to that effect. That's not exactly the way she worded it, but that somewhere buried within here, there's either some statement or something to the effect from your client acknowledging, admitting, whatever, that these efforts were to save- is that there, or what do you say about that? Your Honor, I would say that that is inaccurate. And what I will say is I believe what opposing counsel was referring to is testimony from Ms. Crampton's deposition, where she did say that one of the reasons she was sending these letters was to save her job, but that was only after they started retaliating against her. She sent out two rounds, basically, of letters to officials. And the first round is what we're talking about now, where it was sent in September and October. And only after they started retaliating against her, only after they had written her up, put her on formal discipline and basically showed that they were going to fire her for this activity, did she start trying to save her job, saying, look, they are violating the law and they're going to fire me for reporting this. But her initial motivation in sending this out was what she says it was in her letter, because she was worried that somebody would get hurt and she could no longer sit by and allow this to happen. And a jury should decide if she can be fired for that. All right. Thank you, sir. Thank you. Thank you. Thank you, Ms. Hacker, for your briefing.